## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNIT PETROLEUM COMPANY, ) | |
| UNIT DRILLING AND EXPLORATION ) | |
| COMPANY, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | **Case No. 11-CV-627-JED-FHM** |
| ) | |
| JACK FROST, ) | |
| ) | |
|     Defendant and Third-Party Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| UNIT CORPORATION, ) | |
| ) | |
|     Third-Party Defendant. ) | |

### OPINION AND ORDER

The Court has for its consideration defendant's Combined Motion for Partial Summary Judgment and Brief on the Issue of Contract Interpretation (Doc. 45) and the supplement thereto (Doc. 139), and the Motion of Counterclaim/Third Party Defendants Unit Drilling and Exploration Company, Unit Petroleum Company, and Unit Corporation (collectively, the "Unit entities") for Summary Judgment (Doc. 141).[1]  For the reasons discussed herein, the Court grants the Unit entities' motion and denies Frost's motion.

---

[1]    On March 11, 2013, at the behest of the Unit entities, the Court entered an amended scheduling order (Doc. 109) which reopened discovery and provided a new deadline for dispositive motions, which had already been filed.  Following the close of the supplemental discovery period, Frost filed the supplement (Doc. 139) to his motion for summary judgment (Doc. 45).  The Unit entities filed amended summary judgment papers (Doc. 141), superseding their previously filed motion for summary judgment (Doc. 46).

## BACKGROUND AND MATERIAL FACTS

Jack Frost ("Frost") is a geologist.  In the late 1970s, Unit Drilling and Exploration Company ("UDEC") found itself in need of geologists to assist in the development of additional drilling opportunities due to UDEC's then-recent expansion into exploration.  This led, in 1979, to UDEC hiring Frost as a consulting geologist.  Initially, Frost's consulting work was pursuant to an oral agreement.  In November, 1980, UDEC and Frost entered into a written consulting agreement (the "Consulting Agreement"), which provided that Frost would receive a monthly retainer and an overriding royalty interest ("ORI") of two percent when UDEC acquired leases on prospects recommended by Frost.  The Consulting Agreement in material part provides as follows:

> 1.   Frost agrees to originate drilling prospects, evaluate drilling prospects furnished by the Company, and make recommendations concerning each prospect so originated or evaluated.  The Company shall have the right to acquire in whole or in part the entire interest available in any prospect originated or evaluated by Frost or any other independent petroleum geologist retained by the Company.
>
> 2.   This Agreement may be terminated by either party upon sixty (60) days' written notice.
>
> 3.   During the term of this Agreement, Frost shall receive a monthly retainer of $3,759.00, payable on the first day of each month.  In addition, *during and after the term of this Agreement, Frost shall receive a two percent (2.0%) Overriding Royalty Interest* …. on all leases acquired by the Company on prospects which were originated or evaluated, and recommended by him.

(Doc. 141-1, italics added).[2]

---

[2]   UDEC and UPC filed a motion to strike the affidavit of Fred Turner (Doc. 67), who signed the Consulting Agreement on behalf of UDEC.  The Turner affidavit was submitted by Frost in support of his summary judgment arguments.  Turner's affidavit states that UDEC drafted the Consulting Agreement, not Frost.  UDEC and UPC contend that Turner lacks personal knowledge of who drafted the agreement because he actually has no specific recollection of the agreement.  As will be discussed hereafter, the Court finds that the agreement is unambiguous and therefore the determination of who drafted the agreement is immaterial to the Court's decision.  Accordingly, UDEC's and UPC's motion to strike (Doc. 67) is denied as moot.

As noted, the Consulting Agreement provided that it could be terminated by either party upon 60 days' notice.  The Consulting Agreement was subject to four written addenda, which amended the amount of the retainer paid to Frost and/or the ORI percentage he was to receive. The last addendum to the Consulting Agreement was executed on November 10, 1982.

On or about May 9, 1983, UDEC sought Frost's agreement to a fifth addendum, which would have continued his employment but effectively terminated the ORI altogether.  Frost did not sign the fifth proposed addendum.  The record before the Court indicates that Frost sought thereafter to negotiate an alternative termination agreement, which was never reached.  Frost and UDEC parted ways shortly after May 9, 1983.

For a brief period of time after the Consulting Agreement was terminated, UDEC continued to assign ORIs to Frost.  After 1984, no further assignments of ORIs were made to Frost.  In this same timeframe, UDEC hired staff geologists who did not receive ORIs and UDEC generally began to scale back its operations.  In 1986, as part of a restructuring plan, UDEC's stock was merged and exchanged with the stock of Unit Corporation ("Unit Corp."). UDEC remained in existence but became a wholly owned subsidiary of Unit Corp.  In 1988, Unit Corp. decided to separate its drilling and exploration business, while consolidating its exploration business into a single entity – that being a wholly owned subsidiary of UDEC, Sunshine Development Company, which then changed its name to Unit Petroleum Company ("UPC").  At that time, UDEC assigned its oil and gas leases to UPC.

After his departure from UDEC in 1983, Frost continued to follow the drilling and exploration activities of UDEC and later UPC for several years.  Frost's files contain a letter dated September 23, 1988, addressed to Unit Corp., which inquires about a prospect in Latimer County, Oklahoma.  Frost's letter requested that Unit Corp. "advise [Frost] of [his] status as the

generating geologist and overriding interest owner in these wells and prospects" because he had observed that Unit Corp. had "renewed drilling activity in the area."  (Doc. 141-29).   Philip Keeley of UPC responded to Frost's letter, stating that the company had recently drilled two wells in the area Frost had cited.  Keeley further explained that, "[b]ecause of the current unknowns of the gas market in this immediate area and in our industry in general, Unit has no additional drilling planned at this time."  (Doc. 169-16).  A subsequent letter from Frost to Keeley dated October 22, 1988, states that Keeley's letter "did not address the following concern … [p]lease advise me of Unit's intent regarding the assignment of overrides to me on the new wells."  (Doc. 141-30).  The record contains no further correspondence on this topic.

But Keeley's letter was not the last Frost heard from UPC.  Over the next 25 years, Frost continued to receive Division Orders which would, in most instances, set forth Frost's override percentage and UPC's working interest ownership percentage.  Many of those Division Orders reflected that UPC's working interest would increase, while Frost's ORI would remain the same – a clear indication that UPC had acquired new interests in an area that had been a Frost prospect, but had not made an additional ORI assignment to Frost.  UPC also had a practice of recording any newly acquired lease or purchased interest in existing leases in the applicable court's public land records.  In 2005, UPC drilled an increased density well in Latimer County. As a result, Frost and other ORI owners in the prior wells in the Spiro/Wapanucka formation received a notice stating that "[n]ew leases were taken in this zone, and as a consequence, your override was reduced."   (Doc. 141-39).   Frost signed the attached Division Order and acknowledges that he did not object to the letter or Division Order.

In August, 2009, Frost was joined as a third-party defendant in a lawsuit in Latimer County.  Frost then asserted a counterclaim against UPC, seeking thereby to assert his right to

assignment of an ORI in the property at issue.  In that litigation, Frost's claim was based solely on the alleged existence of an *oral* agreement between Frost and UDEC.  In October, 2011, Frost discovered thousands of pages of long forgotten documents in a storage unit, which included the written Consulting Agreement from 1980.  These documents comprise nearly the entirety of the record in this case, as UDEC was largely unable to locate documents from the relevant period given the passage of time.  On October 12, 2011, UDEC and UPC filed this lawsuit, seeking a declaratory judgment that the newly discovered Consulting Agreement had been fully performed by the parties.  Frost responded with a counterclaim against UDEC and UPC for breach of the Consulting Agreement.[3]

The Court has entered two substantive rulings in this case thus far.  On April 5, 2013, the Court permitted Frost to join Unit Corp. as a third-party defendant to his counterclaim (Doc. 114).  On October 4, 2013, the Court granted UDEC's and UPC's motion to strike jury trial (Doc. 192) on the basis that Frost's claim at issue in this case is equitable in nature.  In its October 4, 2013 Opinion and Order, the Court noted as follows with respect to the nature of the claim asserted by Frost:

> Frost suggests to the Court that it should focus primarily on the fact that he seeks monetary damages, which could amount to a significant sum.  This argument, however, ignores the fact that Frost has no entitlement to damages unless and until the Court exercises its equitable power to compel one or more of the Unit entities to assign ORIs to Frost.  Frost would then be owed money based upon the production, if any, attributable to the property in which he is assigned an interest. Whether Frost is entitled to any assignments, i.e. specific performance, is the key question which now drives this case. Specific performance is a decidedly equitable remedy.  *Fischer Imaging Corp. v. Gen. Elec. Co*., 187 F.3d 1165, 1172 (10th Cir. 1999) ("Because specific performance is an equitable remedy, the case

---

[3]   Initially, Frost also alleged counterclaims against UDEC and UPC for breach of the duty of good faith and fair dealing, deceit, fraud/false representation, and unjust enrichment.  (*See* Doc. 8).  Shortly thereafter, Frost dismissed these claims by joint stipulation (Doc. 13).  Thus, his claims for declaratory judgment (which is merely incidental to the contract claim) and breach of contract are the only claims that remain.  (*See* Doc. 115).

> would not be tried to a jury.").  As a result, the Court finds that Frost's request for monetary relief is "inextricably intertwined" with his request for equitable relief. *See Adams*, 149 F.3d at 1162.  Having so found, Frost is not entitled to a jury trial.

(Doc. 192, at 4).  The Court's prior finding is pertinent to the issues now before the Court, as the Unit entities assert a number of equitable defenses to Frost's claim.

### SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In considering a summary judgment motion, the courts determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 at 251-52.  The evidence of the non-movant is to be taken as true, and all justifiable inferences are to be drawn in non-movant's favor. *Anderson*, 477 U.S. at 255; *see Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." *Anderson*, 477 U.S. at 255.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

 "When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted).  When the record, taken as a whole, "could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Id.* (quotations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir. 1998).

<u>D<small>ISCUSSION</small></u>

### I.      Construction of the Consulting Agreement

The Consulting Agreement provided that Frost would originate and/or recommend drilling prospects for UDEC in exchange for UDEC's payment to Frost of a monthly retainer and assignment of ORIs.  With respect to ORIs, the agreement states that "**during and after the term of this Agreement**, Frost shall receive a two percent (2.0%) Overriding Royalty Interest …. **on all leases acquired by the Company on prospects which were originated or evaluated, and recommended by him**."   (Doc. 45-2, at 1).  The parties have vastly different interpretations of what this provision means.  The dispute in meaning centers over whether UDEC was required to assign ORIs on all leases acquired by the company on Frost's recommended prospects only with respect to prospects that were acquired or developed *during* Frost's tenure with UDEC, *or* whether that obligation extends beyond Frost's employment in perpetuity.  The Unit entities urge the Court to find that the Consulting Agreement is ambiguous and to look to the parties' course of performance to determine their obligations.  The Unit entities further argue that the parties' course of performance will demonstrate that the contract

has been fully performed.  Frost sees it another way.  He asserts that the contract is crystal clear in its meaning and that the Court needn't look further than its four corners to determine the parties' respective obligations.

Under Oklahoma law, when no ambiguity exists in a contract, the intent must be determined from the words utilized in the contract.[4]  *Public Serv. Co. of Okla. v. Burlington N. R.R. Co*., 53 F.3d 1090, 1097 (10th Cir. 1995); *Lewis v. Sac and Fox Tribe of Okla. Hous. Auth*., 896 P.2d 503, 514 (Okla. 1994).  When "a contract is clear and free of ambiguity, the court is to interpret it as a matter of law."  *Lewis*, 896 P.2d at 514.  "Where ... a contract is complete in itself and, when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended."  *Id*.  Under such circumstances, the parties' "intention cannot be determined from the surrounding circumstances, but must be gathered from a four-corners' examination of the instrument."  *Id*.; *see also McClain v. Ricks Exploration Co*., 894 P.2d 422, 428 (Okla. Civ. App. 1994) (citing *Mercury Investment Company v. F.W. Woolworth Company*, 706 P.2d 523, 529 (Okla. 1985)) ("The intention of the parties cannot be determined from the surrounding circumstances but must be gathered from the four corners of the instrument.").

The Court finds that the Consulting Agreement is reasonably susceptible to a single interpretation.  The agreement's language is clear and unambiguous.[5]  It specifically provides

---

[4]  The parties agree that this diversity action is governed by Oklahoma law.

[5]  The Unit entities attempt to create ambiguity as to what constitutes a "prospect."  In essence, their argument is that land recommended for drilling by Frost can only be a prospect if UDEC actually acquired leases with respect to the recommended area "during Frost's tenure."  (Doc. 141, at 18).  The mere existence of an alternative interpretation (implausible though it may be) does not render the term "prospect" ambiguous.  Moreover, the Unit entities' strained interpretation could render UDEC's promise to assign ORIs to Frost illusory.  Under this proposed interpretation, UDEC could have hired Frost, accepted his recommendations of prospects, terminated his employment, and then acquired leases in land he recommended—all with no obligation to assign a single ORI to Frost.  It is clear that "prospect," in the context of the

that assignment of ORIs will be made on Frost-originated prospects "during *and after*" the term of the contract, which ended in 1983 with his departure from UDEC. (Doc. 45-2, at 1, italics added). This language mandates that Frost would receive the assignment of ORIs after he left UDEC on all leases acquired by UDEC on prospects he originated or evaluated, and recommended, without limitation as to his employment status with UDEC. The interpretation urged by the Unit entities would require the Court to rewrite the agreement to include a limitation which does not appear in the agreement. That is, the Court would have to read language into the agreement which limits assignment of ORIs to leases that were acquired or in the process of being developed by UDEC while Frost was still working for UDEC. The Consulting Agreement contains no such limitation. The Court therefore finds that the Consulting Agreement means exactly what it says: that Frost was entitled to assignments of ORIs on leases acquired on Frost prospects during and after termination of the agreement.[6]

## II.    Laches

The Unit entities seek summary judgment on Frost's claim under the Consulting Agreement based upon the doctrine of laches. They argue that Frost's delay of well over two decades in asserting *any* claim under the Consulting Agreement is unreasonable and prejudicial.

---

Consulting Agreement, refers to any land recommended by Frost as advantageous for drilling during his tenure at UDEC, without respect to whether Frost continued to be employed by UDEC.

[6]   The Court recognizes that the Consulting Agreement's terms appear to violate Oklahoma's Rule against Perpetuities, which provides that "[n]o interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." *Matter of Estate of Crowl*, 737 P.2d 911, 915 n.1 (Okla. 1987) (Opala, J., supplemental opinion on rehearing). Oklahoma permits contract reformation under the doctrine of *cy pres* in instances where an instrument violates the Rule against Perpetuities. *See, e.g., Stoltz, Wagner & Brown v. Duncan*, 417 F. Supp. 552, 557 (W.D. Okla. 1976). However, the Court needn't perform an analysis as to reformation in light of its conclusion, *infra*, that any claim Frost might have under the Consulting Agreement is barred by the doctrine of laches.

Frost contends that he was justified in continuing to believe that UDEC was honoring the Consulting Agreement because he had been assured—in 1988—that no further drilling was planned.

As an initial matter, Frost argued in his summary judgment briefing that his breach of contract claim constitutes an action at law, not one sounding in equity.  Frost's briefing on this issue was filed prior to the Court's October 4, 2013 Opinion and Order (Doc. 192) which granted UDEC's and UPC's motion to strike jury trial.  Therein, the Court held that Frost's claim under the Consulting Agreement is equitable in nature because he has no right to damages unless and until the Court exercises its equitable power to award specific performance; namely, the assignment of ORIs to Frost.  On that basis, the Court set this matter for non-jury trial.  Given that decision, Frost's argument that equitable defenses such as laches are inapplicable to his claim is without merit.

"In order to prove the affirmative defense of laches, the defendant must demonstrate that there has been an unreasonable delay in asserting the claim and that the defendant was materially prejudiced by that delay."  *Jacobsen v. Deseret Book Co*., 287 F.3d 936, 949 (10th Cir. 2002) (internal quotation omitted).   "If the undisputed evidence establishes the elements of laches, then the court properly grants summary judgment on that ground as a matter of law."  *Chesapeake Operating, Inc. v. Carl E. Gungoll Exploration, Inc*., 116 P.3d 213, 216 (Okla. Civ. App. 2005). "Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpoise the laches defense."  *Jacobsen*, 287 F.3d at 949 (quoting *Danjaq LLC v. Sony Corp*., 263 F.3d 942, 952 (9th Cir. 2001)); *see also Harrison v. Eaves*, 130 P.2d 841, 844 (Okla. 1942) ("The claim of limitations and laches rests upon the fact that there was

10

some evidence to show that plaintiff knew or should have known [of the offending conduct]"). There is no absolute rule for when a claim becomes stale or what amount of delay is considered unreasonable. *Smith v. Baptist Found. of Oklahoma*, 50 P.3d 1132, 1138 (Okla. 2002). "Application of the doctrine is discretionary depending on the facts and circumstances of each case as justice requires." *Id.*

### A.  Unreasonable Delay

Based upon the undisputed facts before the Court, Frost's delay in asserting a claim under the Consulting Agreement was unreasonable as a matter of law.  Frost unquestionably had notice in 1983, at the time he ended his employment with UDEC, that, at a minimum, UDEC wished to prospectively end the assignment of ORIs to him.  After he left UDEC, Frost continued to follow UDEC's and UPC's drilling and exploration activities for several years.  Frost received no further assignments of ORIs after 1984.   In 1988, Frost sent a letter requesting that Unit Corp. "advise [Frost] of [his] status as the generating geologist and overriding interest owner in these wells and prospects" because he had observed that Unit Corp. had "renewed drilling activity in the area." (Doc. 141-29).   Shortly thereafter, Frost was informed by Philip Keeley of UPC that the company had recently drilled two wells in the area Frost had cited.  Keeley further stated that "[b]ecause of the current unknowns of the gas market in this immediate area and in our industry in general, Unit has no additional drilling planned *at this time*."  (Doc. 169-16, italics added). Frost followed up with a letter stating that Keeley "did not address the following concern … [p]lease advise me of Unit's intent regarding the assignment of overrides to me on the new wells." (Doc. 141-30).  The record contains no response to Frost's October 22 letter and Frost has acknowledged that he has no record or recollection of following up with UPC, or any of the Unit entities, with respect to whether he would receive an ORI on this activity.

Indeed, Frost acknowledged that he had concerns at that time that he might have been entitled to an ORI which he did not receive (Doc. 141-5, at 76-77).  Thereafter, Frost continued to receive Division Orders which reflected that UPC continued to acquire new interests in areas where he had ORIs, yet new assignments were not made.  Frost made no attempt to assert any right with respect to the Consulting Agreement after 1988, until 2009, when he was joined as a party to litigation.

Frost's assertion that he was lulled into not acting by Keeley's 1988 representation that "Unit had no additional drilling planned *at th[at] time*" is unavailing.  No reasonable person, let alone a sophisticated oil and gas geologist, would assume that UPC—a company whose business is to explore for oil and gas—would never again resume drilling activities or that Keeley's letter made any such suggestion.  Moreover, the representation that no "additional" drilling was planned *at that time* did nothing to alleviate the concern Frost expressed regarding whether he would be assigned an ORI in the activity *which had already occurred* and which was the original subject of the correspondence between Frost and Keeley.

Frost also maintains that the UPC had a duty to inform him that they did not intend to make any further assignments of ORIs in 1988 and that UPC committed constructive fraud by not doing so.  This assertion does not defeat summary judgment as to laches.  As noted, Frost does not pursue a fraud claim in this case (*see* fn. 3, *supra*), constructive or otherwise, nor has he made a sufficient showing that UPC had a duty to speak as to ORIs under Oklahoma law. Moreover, the statements made (and not made) in Keeley's letter do not give a false impression that UPC would make further assignments of ORIs to Frost at any time in the future.  The authorities relied upon by Frost do not suggest that UPC violated any duty in not explicitly stating its position with respect to ORIs.  Under Oklahoma law, if a party speaks, he or she

cannot suppress facts in the course of making true statements where those true representations are "used to create a false impression." *Croslin v. Enerlex, Inc*., 308 P.3d 1041, 1047 (Okla. 2013), *reh'g denied* (Aug. 7, 2013) (italics added); *see also Deardorf v. Rosenbusch*, 206 P.2d 996, 998 (Okla. 1949) ("One *conveying a false impression* by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes....") (italics added). Keeley's letter could not create such a false impression because it does nothing to suggest that any future assignments will be made. If anything, Keeley's letter should have aroused concern due to its obvious omission of any discussion as to ORIs, despite Frost's specific inquiry. And indeed it did, as is demonstrated by Frost's reply expressing concern about the lack of response regarding his question about ORIs. Frost made no further inquiry after 1988 and slept on his rights until 2009. "[T]he duty to act with dispatch is especially imperative where one claims an interest in property that is highly speculative." *Chesapeake*, 116 P.3d at 216 (quoting *Winn v. Shugart*, 112 F.2d 617, 622 (10th Cir. 1940)). As such, the Court finds that Frost's delay in pursuing his claim under the Consulting Agreement was unreasonable.

### B. Prejudice

As to the prejudice prong of the laches defense, courts typically recognize two types of prejudice which justify application of laches: evidentiary and economic. *See Albion Int'l, Inc. v. Am. Int'l Chem., Inc.,* 2012 WL 3776866 (D. Utah Aug. 30, 2012) (citing *Danjaq LLC v. Sony Corp*., 263 F.3d 942, 955 (9th Cir. 2001)); *Voda v. Cordis Corp*., 2006 WL 1620238 (W.D. Okla. June 8, 2006) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co*., 960 F.2d 1020, 1032 (Fed. Cir. 1992) (*en banc*). "Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Danjaq*, 263 F.3d at 955. Economic prejudice can come in the form of loss of monetary investments or

economic harm to a business venture that would not have resulted but for the delay in bringing suit. *See Voda*, 2006 WL 1620238, at * 2; *Chesapeake*, 116 P.3d at 216.

The undisputed evidence demonstrates that the Unit entities have clearly been prejudiced by Frost's delay in asserting his rights under the Consulting Agreement. From an evidentiary perspective, extensive harm has resulted from Frost's delay. Three key witnesses are dead: Richard Zieren, UDEC's general counsel at the time of Frost's tenure; Philip Keeley, UDEC/UPC vice president, who corresponded with Frost in 1988 regarding assignment of ORIs and new drilling activity; and William Richardson, UDEC's geologist who was involved in Frost's retention as a geological consultant and would theoretically have extensive knowledge of the prospects generated by Frost. In addition, King Kirchner, the founder of UDEC, is now in his mid-80s and has almost no recollection of Frost or his work for UDEC. Even Frost's recollection of events has been tarnished by the passage of time. For example, Frost had no recollection of the Consulting Agreement upon which his claims are based until he discovered it in a storage unit. UDEC has almost no documents dating back to Frost's time as a consulting geologist. Perhaps most prejudicial to the Unit entities, is the fact that Frost is essentially the only individual with personal knowledge of his work for UDEC left to testify in this matter.

Economic prejudice is likewise present as a result of Frost's delay in asserting his claim. Were Frost to prevail on his claim under the Consulting Agreement and his ORI interest to be imposed on existing leases, the economic viability of those wells could be seriously impacted. In some instances, it may be possible that wells that might be subject to Frost's ORI may never have been drilled. Frost acknowledges that, in some instances during his time with UDEC, he would accept a reduced ORI or waive his ORI to make a particular development economically viable. Were Frost granted the relief he seeks in this case, his ORI would be imposed without

regard to its effect on economic viability.  In addition, were Frost awarded an ORI, he would almost certainly assert entitlement to 12% compound interest under the Production Revenue Standards Act, 52 Okla. Stat. § 570.10(D), on past production royalties he should have been paid.  This would result in a windfall attributable solely to Frost's own delay.  As a result of the foregoing considerations, the Court finds that the Unit entities are subject to significant evidentiary and economic prejudice resulting from Frost's delay.

### III.     UDEC's and UPC's Request for Declaratory Relief

UDEC's and UPC's complaint (Doc. 2) seeking a declaratory judgment regarding the Consulting Agreement is the sole remaining claim in this case.  None of the parties sought summary judgment on this claim, however this Opinion and Order carries obvious implications with respect to the claim.

The Declaratory Judgment Act governs claims such as UDEC's and UPC's. The Act provides: "In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The Act creates two separate requirements that parties seeking a declaratory judgment must meet.  *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008). First, there must be an "actual controversy" at issue.  *Id*.   "Second, even where a constitutionally cognizable controversy exists, the Act stipulates only that district courts 'may'- not 'must'-make a declaration on the merits of that controversy;" meaning it is within the Court's discretion whether to do so.  *Id*.

In light of the Court's findings regarding the obligations imposed by the Consulting Agreement and the Unit entities' entitlement to summary judgment as to the defense of laches,

there is nothing left for the Court to declare with respect to the parties' respective obligations under the Consulting Agreement.  The Court therefore finds UDEC's and UPC's complaint seeking a declaratory judgment to be moot and it is therefore dismissed.

### CONCLUSION

Having found that Frost unreasonably delayed in asserting his claim under the Consulting Agreement, and that such delay resulted in both evidentiary and economic prejudice to the Unit entities, the Court finds that the undisputed facts entitle the Unit entities to summary judgment as to the equitable defense of laches.[7]  The delay in the assertion of Frost's rights spans more than two decades.  Memories have been silenced by that passage of time and evidence has been lost. The policy considerations of finality, fairness, and certainty which undergird the doctrine of laches are served by its application in this case.

**IT IS THEREFORE ORDERED** that the Motion of Counterclaim/Third Party Defendants Unit Drilling and Exploration Company, Unit Petroleum Company, and Unit Corporation for Summary Judgment (Doc. 141) is **granted** in favor of the Unit entities with respect to Frost's claims for breach of contract and declaratory judgment.  UDEC's and UPC's declaratory judgment complaint is dismissed as **moot**.

Defendant's Combined Motion for Partial Summary Judgment and Brief on the Issue of Contract Interpretation (Doc. 45) and the supplement thereto (Doc. 139) are **denied**.

UDEC's and UPC's Motion to Strike Affidavit of Fred Turner or to Take Additional Discovery (Doc. 67) is denied as **moot**.

---

[7]   Given this finding, the Court need not express an opinion with respect to the Unit entities' remaining defenses.  Frost's claim for declaratory judgment seeks a declaration as to his rights under the Consulting Agreement and thus mirrors his breach of contract claim.  The request for declaratory judgment is therefore also dismissed in accordance with the Court's grant of summary judgment as to the contract claim.

In addition, all remaining motions pending before the Court (Docs. 77, 80, 82, 125, 134, 135, 137, 138, 139, 140, and 191) are **moot** in light of the Court's grant of summary judgment in favor of the Unit entities.

All remaining scheduling order deadlines are hereby stricken.  This case is terminated.  A separate judgment will be entered herewith.

**SO ORDERED** this 13th day of February, 2014.


JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE